May it please the Court, my name is Carol Solon. I represent the plaintiffs in this case. I want to address four or five primary issues here today, beginning with the issue of standing. Judge Reel dismissed this case on the defendant's summary judgment motion, finding that not a single plaintiff in this case had demonstrated standing on any basis to challenge any of the ordinances here. By any measure of the standing rules, the prudential rules of standing, the plaintiffs met that requirement here. I don't understand something. It looked to me like they're not being stopped from anything they want to do. There's no likelihood that they'll be stopped from doing whatever they want to do. And the only harm I could see was they say we need to apply for a permit eight weeks in advance. But then when I look at the ordinances, they don't. It's just 48 hours for one kind of permit and 72 hours for another kind of permit. Well, Your Honor. I don't get it. What's the problem? Okay. Let me address Your Honor's question. First, at the outset of this litigation, it was eight weeks in advance. The city changed the ordinance and the administrative instructions implementing it, I believe, six or seven times since this litigation began, and each time in direct response to an argument made by the plaintiffs. And that would include last week when the city issued a completely new set of administrative instructions attempting to deal with the issues raised by the plaintiffs in the reply brief in this case. Do we have those? They were delivered to me. I don't have them. I don't think I have them. I don't have them. I'm sorry. I have a copy. Well, good. You should have a copy, too. But the issue, Your Honor, is that remains. There remain several critical issues here. One is that even under the most recent version of these ordinance, the ordinance itself is woefully deficient. Well, what is the most recent? Which argument of yours on appeal did these new administrative instructions deal with? May I ask if we could just see those? Do you have copies of these? One copy. Oh. I mean, it's a crazy way to have an argument. We don't know what we're talking about. Yeah. I'm just curious as to which of the issues on appeal. What law should we make the decision under? What version? Well, Your Honor, I think that's a good point. The Court should make the decision under the ordinance itself. First and foremost under the ordinance. Shouldn't we make the decision under the ordinances that you challenge? Well, that the ordinance that we, the ordinance that is before this Court now, as it is, as it was submitted in the excerpt of record, is unchanged since the city last filed, I believe it was with their opposition brief. If you recall, Your Honor, the city asked for a two-month extension after we filed our opening brief in order to allow the city to amend its ordinance again. And at that time, the city filed a supplemental excerpt of record in which they included the newly revised ordinance. And we have that. Yes, that we have, Your Honor. It was included in their brief. The ordinance has changed. Their reference on the administrative instructions is to a website. So I'm assuming if we went on the website last week, we got a different set of rules interpreting the ordinance than if we went on it today. That is correct, Your Honor. The regulations were posted last week. But the regulations in this case, and I hesitate to call them regulations. They are not regulations. They're not promulgated. They are administrative instructions that have changed frequently over the course of this litigation and could change again tomorrow. Oh, so they're not regulations? No, they are. I thought you were talking about regulations. No, they are administrative instructions. They are not promulgated. And like the boss tells the people that he or she supervises what to do, either orally or in writing, and this is telling them in writing? That's correct, Your Honor. And the problem That can change from moment to moment. It can change from moment to moment. And the problem here, too, is that the administrative instructions, but not the ordinance, both expanded and contracted the reach of the ordinance in certain key respects. For example, and this is a critical issue, by administrative instruction only, the reach of this ordinance now applies to any person, a single person, and we dealt with this in a reply brief, but it's still there, a single person who advertises their event. Okay. Has that changed? The only thing that has changed is that in the set of regulations, the administrative instructions put before the Court, the city used the word publicized. The city now uses the word advertised. But I checked in the thesaurus in the library here, and the words are interchangeable. I was trying to think why that's a problem. I was thinking, well, the city has a reason, if there are going to be 150 people or more, to have some provisions for bathrooms and traffic and pedestrian traffic and all that sort of thing, and if it's only 15 people, it really doesn't. And then I thought, well, the advertisement could just be by one person. But I'm thinking, you don't put an ad in the paper unless you're hoping to draw a crowd. You don't know how big a crowd, and you can't find out if it's more than 150 until after the fact when it's too late to require any porta-potties. Well, Your Honor, a couple of things. First, you only need toilets under this ordinance if you're doing a Category 1 event. You don't need it for a Category 1 event. I just gave that as an example.  There are a lot of things you do for a big crowd that you don't do for a few people around a picnic table. Correct. But the problem is that, first of all, it doesn't require you to take an ad in a newspaper or anywhere. It just simply requires you to advertise, which means to promote your event. And let me give you some examples from case law, and I think that there are several good ones. In the Church of the American Knights of the Ku Klux Klan, the Seventh Circuit decision written by Judge Posner, which invalidated the ordinance in the city of Gary, Indiana, the Klan there had held one demonstration which, obviously, with all this litigation that went on, it was probably a lot more than advertising, even if it was a paid advertisement in a newspaper. The media promoted the event. Twenty-seven people were at the first event, and the anticipated number of people that the Klan expected to turn out for the second, hoping against hope, I guess, that they would get this number, was 50. Either way, they would not – there is no evidence in this record, and there certainly is no evidence from the empirical case law. My guess is that Food Not Bombs is a whole lot more popular than the Ku Klux Klan. I think so. But even Food Not Bombs, there is no evidence in this record, and there is no evidence otherwise to assume that if a person promotes their event, one of the – How do you know one way or the other? With the Ku Klux Klan, you knew from history that they're not going to get any large crowd. Well, Santa Monica knows from history. For instance, Jerry Rubin, who has been before this Court on some of his election issues, Jerry Rubin conducts fasts all the time in the city of Santa Monica. His most recent one was that he was going to fast until Ralph Nader withdrew from the presidential election. I can assure you that the city would not be able to come up with a shred of evidence to support that anyone, let alone 150 people, come out to watch Jerry Rubin. But – Let me tell you what problem I have with this. The ordinance says 150 people. It doesn't say anything about publicity, right? Right. If somebody tried to prosecute under this – you under this, wouldn't you simply go and say – and you didn't have 150 people. In fact, 150 people didn't show up. You just say, you know, we didn't have 150 people. We didn't violate the ordinance, period. But, Your Honor, here's the problem. If that argument is correct, then what we have is the argument in United States v. Washington. We have a lack of due process, because you would have to stand a violation. You would have to undergo a prosecution, rather, in order to effectuate your rights in this instance. But more importantly, you would have to be – More than that, I guess what I'm thinking is this, that if I were the city, I would change the sentence, and I would say, you know, we are advising people that if you publicize, you may have more people than you think, and this is at your risk, because if more than 150 people show up, you're going to be having an event without a permit. But isn't that essentially what they have to be saying? Well, no, Your Honor, because you wouldn't be having an event without a permit. And the – to complete the example about the Klan march in Gary, Indiana, although only 27 people occurred – appeared on one occasion to participate in the march, 150 to 200 appeared to protest against the march. And the same thing happened for Mr. Termaniello in Chicago. He appeared to speak to a group. Now, he was in a private auditorium, but let's assume for the sake of this argument that he was on the street corner or he was in a city-owned facility. He appeared to speak to a small group of people who shared his, as it was characterized at that time, fascist views. 300 to 400 people, according to the Supreme Court record in this case, 300 to 400 people showed up to protest. So what is it that you need a permit for? Do you need a permit because people might come out to protest your activity? Well, look, there's ways the city could write this. One is the way they did. Another way is the way Judge Berzon suggested. And I guess if they did that, if they were saying, if you advertise, you're at risk of violating the permit requirement if more than 150 people show up, and then you wind up being successful beyond your dreams, you just have to have your organizers go around and tell people, please leave, we're going to get in trouble. Please leave. Please leave. And it's a whole lot easier to get your permit. Well, Judge Kleinfeld, it's not a whole lot easier, and let me explain why. First of all, you cannot base the need to get a permit on the number of hecklers who show up. That would be a violation of someone's First Amendment rights, and particularly here, because when you get a permit here, you must agree to hold the city harmless, you must indemnify the city completely, or you must pay insurance. That's totally neutral. I mean, every time our bar association has its picnic, we've got to get one of those million-dollar policies, costs about $180, and promise to hold them harmless. We had to do the same thing. We had my daughter's wedding reception in a public park. It's just routine, neutral in probably most municipalities in America. Well, the fact that most municipalities have it, Your Honor, does not make it lawful. Well, it tends to show its neutrality and impartiality and its utter disconnection from content or viewpoint. And also, its lack of burdensomeness. So many people get these permits, and the insurance is readily available and cheap. Well, Your Honor, there is no evidence in this record that the insurance is readily available and cheap. What there is in this record is evidence that the city of Los Angeles next door does not charge. In fact, it's the same thing. I thought that there was – I keep losing track of where we are here because everything keeps changing, but I thought where we were was that the First Amendment events don't need to get insurance. I'm sorry, Your Honor. I thought the First Amendment events don't need to get insurance. They need to get hold – they need to sign a hold harmless clause. Actually, Your Honor, what the section says is that – and this is the administrative regulations or the administrative instructions again. You don't have to get insurance if you agree to indemnify and hold the city harmless for anything that happens for any reason whatsoever. Right. And then you say, in fact, the city isn't going to be liable. Well, if the city is not going to be liable, then holding them harmless isn't going to cost you anything. So what's the problem? Well, it is going to cost you something, which is what happened in NAACP v. Claiborne Hardware. The NAACP was prosecuted. It went all the way up to the U.S. Supreme Court. But you cannot impose that obligation. There is no – first of all, as we've argued in our briefs, there is no liability for the city. Right. So if there's no liability, then holding them harmless is holding them harmless for zero. But you condition it for people on having to agree to do that. And although there is no liability for the city, the city's regulations and instructions say that you have to hold, and what you sign as a contract is you hold the city liable – harmless and agree to indemnify the city, both, for anything that occurs, even baseless lawsuits. So it isn't that if there's no liability, you're free. It's that you have to pay the costs of the city defending against a baseless lawsuit as well. And that's clear in the city's law. It's just like the duty to defend and liability insurance. Insurance company has to defend. Kagan. Is there any case law invalidating a – not the insurance issue, but the hold harmless clause of this kind? Well, the case law in California, Long Beach gave pride, which we cited, says that you shouldn't be charging for insurance. You shouldn't be requiring indemnification. And I understand that. I'm not talking about the insurance. I'm talking about the indemnification as well, Your Honor. It says you can't require people to indemnify the city since the city cannot be held liable under State law. So it isn't simply the insurance. It's the indemnification as well. But, Your Honor – Indemnification is a substitute for the insurance. That's correct. That's correct. You don't even have to pay the premium. That's correct. But the problem with the Santa Monica law, Your Honor, is that you have to agree to indemnify the city, and then the city can collect from you whether the people had a right to – had a basis in pursuing the city or not. So – Well, no, that's not what it says. It says you have to defend the city whether they have a basis pursuing the city or not. It's just like the duty to defend in an insurance policy. Your Honor – You have to defend the city, and if they recover against the city, you have to pay. If their claim is baseless, they don't recover. It says regardless of the merit or outcome of any such claim or suit. That's what it says, Your Honor. It's just reading part of the sentence. Defend, indemnify, and hold harmless its council boards, commissions, et cetera, against any and all losses, damage, liabilities, claims, suits, costs, and expenses whatsoever, including reasonable attorney's fees, regardless of the merit or outcome of any such claim or suit. So if the city says we're going to hire – we're going to pay for this lawsuit and we have to take depositions, and the lawsuit turns out to be baseless, this language clearly says you are liable to pay the city back for that. Let me see. Did you say you have a case that says that's a First Amendment violation to require a group either to buy insurance for the municipality or if they don't want to buy insurance to hold the municipality harmless? Well, let me – let me just address one other thing at the same time, Your Honor, and I will give you the case, all right? I'm going to forget my question. No, you won't. I won't forget it. I won't forget it, Your Honor. But I'll forget it. I won't know what you're talking about or why you're talking about it. What are you telling me? I'll remind you. I'm writing it down. I'm making a note, okay? You won't answer my question now? You want to talk about something else? No, no, no, no. I just want to include one thing in it, okay, which is that if you are not willing to indemnify or hold harmless the city, then you have to take out an insurance policy. And the insurance policy is itself fatal here because the city manager may do one  He may set the policy at whatever he believes is reasonable, or he may waive the policy without any standards or guidelines if it's an event of less than a day and he thinks that the risk is minimum. So we have a standardless, a standardless provision. I remember my question, but I'm not getting to it. The question was did I have a case that says, that applies the insurance issue in the First Amendment context. Long Beach and Lesbian and Gay Pride Parade is a First Amendment case. It was a challenge to the city of Long Beach's parade ordinance scheme. That's not exactly what the question was. The question was, is there a case that says it's a First Amendment violation to require either insurance or if the organization doesn't wish to get it for the organization to require the organization to hold the municipality harmless? I think you're Does Gay Pride hold that it is a violation of the First Amendment? It holds that the ordinance in question there and the request for indemnification are both themselves violated of the First Amendment rights of the permit applicants. But, Your Honor, I believe that NAACP versus Claiborne Hardware, which says that there cannot be liability under the First Amendment for tort liability, without evidence It has nothing to do with permits. That's about whether an organization can be liable for damages because of speech that led to violence. Well, I would look at it slightly differently, Your Honor, which is Long Beach case in the blue brief citations. It is in, I know we cited it extensively, Your Honor, and I'll tell you the page of our opening brief. We cited it at page 36, and we cited another California Supreme Court page, case at page 38, that dealt with indemnification in a non-First Amendment context. Certainly, if you can't do it in a non-First Amendment context, it would be difficult to believe that there would be some greater justification for doing it in a First Amendment context. And that was Societe Perazione d'Inavigazione Italia versus City of Los Angeles. Are you going to talk at all about the spontaneous exemption and the city hall law and all that? Yes. Let me turn to the spontaneous speech exemption. The city has, in response to the plaintiff's complaints that the original ordinance did not permit at all for spontaneous speech, the city crafted a narrow exemption that allows for spontaneous speech for any event coming into public knowledge or news within 48 hours. And then if you want to engage in spontaneous speech and you can sit within the constraints of the less than 48 hours, you are limited to city hall law, and that is regardless of the target of your ---- So this is my question. There's a fair amount of case law in this city which recognizes the importance of spontaneous expression. But the time periods that we're talking about were much longer. And here we're talking about a two-day time period. I guess the question is that whether the general recognition that permits spontaneous speech are available for some size events under some circumstances doesn't recognize that there has to be a cutoff point of something. So what is the cutoff point? If it's not two days, is it 36 hours? Is it 12 hours? Is it 4 hours? What is it? Well, Your Honor, I think it depends on the size of the event and the location of the event, among other things. The need for the city is to prepare for traffic regulation. That is the interest that is most significant here. That's not the only interest. I mean, other interests, that's the strongest interest, and I would agree with you that probably with regard to parades is where the ---- or parades on streets as opposed to sidewalks is where the government's interest is the strongest interest in which the two-day limit might be, you know, presumptively reasonable. But even in parks where the interest seems weaker or other public spaces, there are other interests such as which depends partly on how large the crowd is. If you have 10,000 people, you might want to know two days in advance to deal with them. And partly with competing uses. If somebody else has that place at that time, you may end up with fist fights. At least those two interests, aside from traffic. Well, I think that is true, Your Honor. But the only spontaneous activity the city regulates is spontaneous expression. The city does not regulate the group of friends who decide on Sunday afternoon that they're going to go down to the park. Well, I thought they do with places where there are 150 people. Well, no, they don't really. I thought this events ordinance applies both to people who are speaking and people who aren't. But they apply a different standard. So that if I am – let's say, for example, that Vice President Cheney is going to speak at the Sheridan Miramar or at the Lowe's Hotel down on the beach in the city of Santa Monica. And I must say all the hotels in Santa Monica are on the beach. There is no other location. I have difficulty engaging in speech there for a couple of different reasons. One is a hundred and – Let's just go back to your hypotheticals. I think it's wrong, unless I'm missing something. If 150 friends decided to have a spontaneous engagement party because somebody announced their marriage and they all decided to go to the beach and there are 150 of them, they'd have a problem, right, without a permit? Well, I don't think that's the case. I mean, whether they really would or not, I don't know. But according to the ordinance, they would. Well, if 149 people went, they wouldn't need a permit. And 149 people went to protest Cheney and no one either. Well, if I'm Saturday morning, if I read in the newspaper on Friday afternoon that Cheney is going to be speaking at an event at a hotel in Santa Monica, which has happened. President Clinton used to stay at the Sheridan Miramar during his entire time in office and there would be demonstrations that people would try to have there. And that was actually before we had this ordinance. It was a time period where there was no ordinance in Santa Monica. But if I read – If I read in the newspaper that Cheney is going to be speaking at an event at a hotel in Santa Monica, you wouldn't have a problem because nobody's organized a demonstration. Nobody needs a permit. It's just a bunch of individuals that show up. Well, that's not true, Your Honor. If I – if I send out a press release and I say – Ah, now you've changed the hypo. Your previous hypo was you read in the newspaper. I hadn't finished. You read in the news that Cheney is going to be at the hotel. I hadn't finished. New hypo. You send out a press release. You cut down a street at the hotel. No. Same hypo. I read in the paper or I hear on the news on Friday night that Cheney is going to be at the hotel on Sunday night for a dinner. I can't go down and get a permit because I can only get a permit between 8 and 5, no matter where I go. I can't go to the police department after 5. I can't go to City Hall because it's closed. And so, you know, and if I send out an announcement that people are going to meet outside there, even if there are only going to be 30 of us, it's going to be, you know, the Society for the Protection of the Green Toad, something like that, I now – But you're back to the publicity issue. I now fell into – But you're back to the publicity issue. Let's take the publicity issue out of here. Okay. Okay. And now I'd like to know why is this, in terms of the city's interest, any different from a non-speech activity of the same size? It is different because the city chooses to regulate only spontaneous expression. The ordinance doesn't say any spontaneous activity. I'm really confused, because what the ordinance actually says is that nobody of – whether you're speaking or aren't speaking can have more than 150 people unless you get a permit, doesn't it? Well, it doesn't, Your Honor. It says that only as to certain activities, certain places. I don't know what the meaning of that is. I want to be really clear, Your Honor. Section A doesn't require the 150. Section A is a parade, march, or assembly. All right. That applies to any size. And the next one is any activity or event involving 150 or more persons on city-owned control to maintain property, not subject to the requirements of subsection A. So what's the problem? Well, the problem is that if I'm going to engage in expression, if I'm going to do a march or assembly, I'm not falling within Section B. I fall within Section A. And so there's no size limit on that. Sorry. Why you fall to Section A? Because it says so. It says not subject to the requirements of subsection A. I understood that to be a parade. A parade, procession, march, or assembly. Right. On any sidewalk. So I'm still not seeing why that's any different from a similar bunch of people in a similar place who aren't speaking. Well, because it doesn't create a limit. If I'm not a parade, march, or assembly, then I have a rise to the level of 150. I don't get what you're saying. It looks to me like what subsection A is for is even if you have fewer than 150, you might be able to, say, block the Bay Bridge, if you were in San Francisco, with 30 people. A bunch of people just line up and hold hands and block the Bay Bridge. Big impact on traffic. A bunch of people can't make it to work that day because of 30 people. So if there's any similar street in this municipality, I don't know anything about this municipality, Santa Barbara, or Santa Monica. I don't think I've even been there. But if they have any important street like that, 5, 10, 20 people might be enough to block the street. So you don't need the 150. If it's in a park or something, it's not on a street or sidewalk, then you need the 150 to get in trouble. Is that the way it works? No. Because if you read section A, it has an or, not an and. And it says you either may impede, instruct, impair, or interfere with the free use of all public property, including sidewalks, and other areas where the city doesn't have an interest in regulating traffic, or you don't comply with traffic regulations. I just want to sidetrack from where I started from, which was to see if we can understand why the at what point the government has a sufficiently strong interest in knowing in advance, and how much in advance, that there's going to be a large group. It may depend on size. It may depend on where. It may depend on how much time. But how do we cut those lines, and why is this over it? That's really where I'm at. I'm sorry. And why is this over it? Why is the two days? What we have here, as I understand it, is you have to tell us within two days, or you can go to the city hall law. And why is that an unreasonable accommodation of the city's or a unconstitutional accommodation of the city's interests, given the general recognition in the case law that some kind of notice is permissible under some sort of circumstances? Your Honor, I don't disagree that some sort of notice is permissible, but the requirement for notice depends on the size of the group. And nothing in this ordinance says the spontaneous expression is limited to groups of 150 or more. It simply doesn't say that. And it simply says events occasioned by news or affairs coming into prior, you know, to knowledge less than 48 hours. The other problem with this, Your Honor, is that in the example I was giving of Vice President Cheney coming to speak, I can't get to this. If I don't – if this doesn't come into news until the 5 o'clock news on Friday, and I can't go and apply for a permit until 8 o'clock the next morning, and the event is on Sunday night after 5 o'clock, then I can't get a permit to be anywhere except City Hall alone, and City Hall alone is irrelevant. It seems to me that if you were to win on this point, then the people that like Vice President Cheney could, without a permit, string themselves across the critical roads that would get you to your demonstration, prevent you from getting there by blocking traffic, they would have a First Amendment right to do this without a permit because there was not time to get a permit, and you could never get to your demonstration. Your Honor, we are not arguing that anyone has a right to block a street without a permit, and I think that the Supreme Court – I thought you were. No, Your Honor. I have never said that, and nothing in our paper says that. What we have said is this ordinance applies not simply to streets, but to every public forum in the city practically. It applies to sidewalks. Blocking sidewalks or demonstrating on a sidewalk is totally different than blocking a street. And – No, it's not totally different. People use a sidewalk to get from one place to another. Your Honor – So the Republicans who are supporters of Cheney could block all the sidewalks. Your Honor, we are not arguing that – Demonstrators away. Your Honor, we are not arguing that anyone has a right to block something so that no one can pass by. I thought you were arguing that you do. Your Honor, I have never said that, and there's nothing in our papers that says that, quite frankly. There really is not. But this applies – I keep getting lost on what's at issue. It looks to me like everybody that applied for a permit got one. Answer is the only plaintiff that didn't get a permit, but they never asked for one. They said they need eight weeks to gear themselves up. And it looks like you can get the permit without any of the limitations that would make it problematic. I just don't get it. Well, Your Honor, I disagree with the facts. I don't think that Answer ever said they needed eight weeks to gear themselves up. In fact, when this litigation began in the Declaration of Jim Lafferty, there was no spontaneous speech exemption. There was no restriction except eight weeks in advance for an activity of any size. But there is now. Well, Your Honor, there is not anything fixed, because there is some change in the administrative instructions. But the administrative instructions have changed, and sometimes once every eight days. And so there is nothing fixed here. Is it true that everybody got a permit that asked for one? No. And Answer never asked for one? No. Well, it – Who asked for one that didn't get one? Your Honor has asked me a compound question, so let me answer that question in parts. Okay? The – first of all, there is no requirement to submit yourself to an unconstitutional permit process in order to get a permit. Okay. You're not answering the question. No, no, no. I'm going to answer it, Your Honor. You're answering a different question. There is no evidence in the record about who got permits or didn't get permits. There is just absolutely none. And even – pardon, Your Honor? There's no evidence that anyone got turned down for a permit? There's no evidence about who applied and who got turned down. There is one declaration from a city official that says, well, when Victor Nara, one of our declarants, complained, it was really different. But the city doesn't explain how it was different. And that was one of the instances where they – where they demanded a million dollars of insurance to do a protest outside the gap on the Third Street promenade that had no threat to anyone, blocked nothing whatsoever. But that would be an alleyway or a public way that would be covered in this city. The fact that some people may have gotten permits – and there's another discussion which we disagree with in terms of an application for a permit for the anniversary of September 11th. But beyond that, there is no evidence in this record. And even if there were, the fact that people got permits in the past because they were willing to submit to conditions for insurance and indemnification that my clients are not willing to submit to does not legitimize an unconstitutional ordinance. This ordinance has nothing in it that limits discretion. It vests city officials with the ability to waive insurance without any standards or guidelines. It vests them with the ability to apply insurance at whatever level they want. It gives – it has administrative instructions that have changed five times since this litigation began, including, as we indicated at the outset of this argument, last week. And it applies such things as spontaneous activity to any activity of any size. And, Your Honors, you know, I must respectfully submit that the city wrote an ordinance that created different categories. It created events of 150 on city-owned property. It created a category for parades and assemblies. It created a category for spontaneous speech. It treated each one of them differently under this ordinance. And so it's impossible to collapse them altogether. We're way over time, and we're probably fading here a little bit. You might want to wind up. Thank you, counsel. Mr. Rosenbaum, representing the appellees. May it please the Court, I first want to begin by apologizing to the Court that the city, what's an A.I.? An administrative instruction, which opposing counsel has referred to. What does it say? Well, there were essentially just two changes that were made in the instruction. There were other modifications. And the city debated long and hard whether to do it, because the city, in fact, didn't think it was necessary. But it referred to two of the arguments that were raised. One was this issue of publicity. And it changed publicize to advertise. Advertise. And it's advertised in advance by the applicant. Okay. That's the entire. What's the other one? The other one, the other change was the opposing counsel focused in the administrative instruction on one of the rules that if you do an event on a sidewalk in the city, and you only, you stand two abreast, you're at 500 or less, you're in units of 50, you don't need a permit at all. So, I mean, repeating. Counsel, can I ask you a question on this A.I.? What are they? Are they binding? Does the city council enact them? Can the city council change them at whim? Or do they go through the same process as an ordinance? Because it seems to me I'm having difficulty getting my hands around what is the argument here? What is wrong? What's unconstitutional? And what's the city's interest in X, Y, and Z? And part of that is because of the moving nature of these A.I.s. I can't figure out, are they binding? Who are they binding on? The administrative instruction, the ordinance stated that the city manager shall adopt an administrative instruction. Now, this is not the only administrative instruction in the city. So if, for example, if somebody is prosecuted under the ordinance for, I'm trying to think of an example, for not having insurance, and they say, oh, but the administrative instruction says I didn't have to have it, do they win or does, or is the administrative instruction simply sort of a prosecutorial directive as to who to prosecute? Is it binding on the court, I guess is what I'm asking you, as opposed to is it binding on the city officials? The administrative instruction is adopted to, is executed by the city manager to guide staff, to inform staff. So it's not enforceable in a court. So if I went to court and I tried to defend on the ground that the administrative instruction said I could do this, that wouldn't be worth anything because the administrative instruction is simply a directive to staff about what to prosecute, but not a directive to individuals as to what the violation is. Is that right? Well, the administrative instruction is to inform and to guide and to detail the discretion of staff so that they, as to how the ordinance will be applied. So as an example, getting back to the other change, the administrative instruction gives a firm rule as to when an event on a sidewalk will not trigger the need for a permit so that there's no ambiguity, there's no discretion. And so in the administrative instruction it says, as I indicated earlier, that if you'd have 500 or less, you have, you stand two abreast and you stand in units of 50 so as to enable other individuals using the sidewalk to pass through, if you do, if you conduct your event in that manner, there is absolutely no need for a permit. And that really addresses, in my mind, opposing counsel's claim about spontaneous, need to do a spontaneous event. The ordinance and the way it is administered is for a patient. And if some district attorney decided to nonetheless charge you with a violation of the ordinance for doing this, what would be your recourse? I think that's what Judge Ward was asking, or at least that's what I'm asking. What would be the recourse if somebody, some district attorney decided nonetheless to charge a violation of the ordinance, construing the ordinance somewhat different? Is a court going to be bound by what's in these instructions? Certainly, the city, the ordinance has never, no one has been, I believe there's only been one citation under the ordinance. I understand that, but I'm just trying to understand. And the district attorney wouldn't bring an action under the ordinance. This would only be brought by the city attorney office. And the city attorney would certainly not pursue an action if it was done in accordance with this administrative instruction, would clearly not bring an action, so that that circumstance would not arise in the event that... My question's actually broader. My question is, say I'm someone who wants to plan one of these events, or I get word that President Clinton's here and I want to protest. Where's my notice? What do I need to do? I mean, if these AIs are changing every week, what tells me what do I have to do? And isn't that what we should be construing? Because after all, this is a permitting role. And then we need to look at the ordinance, right? Say we can do this, we can't do that. And then what's the city's reasons for imposing this requirement, for example? Why does the city limit the venue, with that regard to these AIs, why does the city limit the venue for spontaneous expression to city hall? But what's the city's legitimate interest in doing that? Well, one clarification that I want to make, and then I'll hopefully be answering your question, but I think it's important, is the ordinance doesn't say spontaneous expression. It says spontaneous events. Spontaneous events. And I think that's important because, as with the rest of the ordinance, the ordinance doesn't care about, the city doesn't care about the... Except, if you read the remainder of that sentence, and I really do want you to answer my question. If you read the remainder of that sentence, it says, spontaneous events which are occasioned by news or affairs coming into public knowledge less than 48 hours prior to such event. That sort of recognizes that we're going to be dealing with expression if we're talking about things in the news, in the marketplace of ideas. I think it could be, it may well often be that, because Opposing Council, for instance, talked about the war in Iraq, but it may be just a celebration that you want to celebrate some sports victory or something that just occurred less than 48 hours in advance. But it's thought. The purpose of that, and it was at the suggestion of Opposing Council, not that we thought that it was legally obligated, because we believe a two-day turnaround is sufficient. I'm talking about why the location, why the exclusive location, because I am familiar with Santa Monica. I've spent a lot of time in Santa Monica, and there are other venues which are safe for demonstrations, or appear to be, the beach, for one, and you talk about them throughout the AI, the pier, the carousel, whatever, Ocean Avenue. I mean, why are you limiting this to City Hall? It was actually at the suggestion of Opposing Council that they thought that there should be one, a location where events like this could happen, but I want to be. Because before you had no locations where events could happen? No, I don't think that's the way to, before, if you do an event, it gets, the ordinance is not triggered for parks, and I can talk about the two different distinctions. The ordinance is not triggered for parks until you have 150 people. So if your event is less than 150 people, and by the way, it doesn't count the hecklers, that is not included in the 150. Well, how would you, I wondered about that, but when Opposing Council was talking about it, I'm not sure how you'd know that from the ordinance, or from the AI, for that matter. Yeah, and you so often answered my question, which is, what is the city's interest in limiting the venue to City Hall, or what is the city's interest in imposing the 150-person people requirement? Well, the 150 people requirement, I mean, the record is quite substantial, I feel, as to the need for the city, for the, you know, as you, and you're familiar with the city. So the city is extremely small and dense. It's only eight square miles. It has a residential population, and this is all in the record, it has a residential population of 90. Right, right. And we know all that. But say, but I'm asking specifically with respect to limiting the venue to City Hall. What is the city's interest in that? And we have to tie it to some interest, right? What is it? Right. We simply, it was a location that could be amenable to a large crowd of individuals larger than 150. It was a location where we didn't think, where we thought that if it was less than 48 hours' notice, that that was a location where it would be appropriate for that type of... Can you give me a record about why? I mean, I can think of reasons why. For example, it's City Hall, so there are police, there's security around anyway, but is there, I think, a record about that? I'm not sure if there's a record. The police department is directly behind City Hall, but I don't know that that's clear in the record. I would, it may be in the staff report that we provided when we made that change in the ordinance. I think it goes, I mean, I feel like we didn't need to add that. And so to say, well, why didn't you put it somewhere else or why don't you allow it somewhere else is assuming that we had, we were legally obligated to do it. And so... We have a case saying 20 days is too much. We have Watchtower in the Supreme Court saying in general spontaneous expression is important, but that's small groups. We have Grossman saying you can't do it for small groups. And we have some mutterings, some, one of the cases suggests that some cities have no time limits. Some have 12 hours, some have 36 hours, some have two days. Where are we supposed to, is there any case holding that there is some time limit that's absolutely okay for a certain size group? We struggled with the appropriate time limit. We knew that if there's going to be a permitting scheme, which has been well-recognized and been completed... I'll ask you a specific question. We looked at, we looked at, it's in Richmond, for instance. We looked at Richmond, which in saying that 20 days was too long, it had had a string cite, which I'm sure this Court's familiar with, with what other cities do. Right. I think Richmond acknowledged that that was dicta, you know, because that wasn't before then. But it certainly suggested to us that those, that that analysis was, that those cities were at least looked to as being, was it reasonable. Now, some of those, and the average of those cities, which we looked at, was three days. Well, we went under the average. So we, we were, the city was cognizant of the case law, cognizant of our right to, to, to have a permit requirement, and wanted to be very conservative. And that's, and also in Richmond, there was also, as I'm sure the Court's aware, there was a footnote which, and I don't have, don't know the names of those two cases, but there were two cases which they cited as published decisions. I believe they were district court, lower court decisions, where two days... Right. ...was found acceptable. So we, the city's... Is the bottom line that there is no case either holding that, that a given time limit is okay or saying that, that no time limit is okay? There's just no case law ultimately deciding this question in any circuit anywhere? Well, I think, no, I think those cases decided it, and I could, in the footnote in Richmond, there are two cases which are cited... Which were district court cases, right? I believe so, Your Honor. I think the, the, the, while we, the city will continue, you know, obviously has the two-day turnaround requirement, I think the Supreme Court decision in Thomas, as well as this Court's decision in Southern Oregon, calls into real question whether or not, as part of a facial challenge, which is what we have here, we would need to have any time limit specified in the ordinance or the administrative structure at all. I think that's a, that, that, that in fact, reading those two decisions, Thomas, of course, was a 28-day turnaround... No, but those were about different, those were about something else. Those were about how fast the, first of all, South, South Oregon's on re-hearing right now, but second of all, there is, it's pending on a, on a bank petition. But second of all, there is, those cases were about the, as I understood, at the time that the city had to act from the time that they got requests. They weren't about how far in advance of the, of the event the request had to be made. Well, I thought that Southern Oregon was a, was a case about, I mean, in that case, if I remember the facts correctly, there were several months before they acted. But the, the city must, must act on your application within 48 hours. Well, that's something I was wondering about. If the city has to act within 48 hours and you have to, and you can ask up to 48 hours, you could get zero notice. Is that right? If you ask, if you ask 48 hours in advance and, and the city takes 48 hours to decide, then you're not going to be able to hold your event. Well, you may get notice right before, you, you will get notice right before, if someone chooses to come in, you know, exactly 48 hours before they want to do the event, they will, they could get notice right before the event occurs. But that's, we don't have any, you know, that's, that's, we don't have any evidence that, that that's normally what people do. In fact, people want to, want to get more notice so they have the opportunity. But if you were dealing with one of these late-breaking things, you're essentially saying, well, we're, we're giving them two days, but you're really not giving them two days. You may be giving them five minutes. I, I don't know how else to, with a permitted scheme, I don't know how. I guess that the public has it two days in advance, and then if they don't get their permit, either tell people once they break their 150-person limit to go home or organize somewhere else, or else they could move, move it to groups of two abreast walking down the sidewalk. Is that right? That's right. That's right. Can I ask you a little bit about the publicity? Sure. Thank you. This is essentially the question I, I asked Ms. Helbel. I, I, the ordinance says 150 people. It doesn't say anything about advertising, publicity, or anything else. If 150 people don't show up, it can't be a violation of the ordinance not to have had a permit. Is that right? That's correct. So what does this thing in, in the AI mean? The AI is simply, was, is, was simply intended to be a, a tool for the city to, to predict the size of an event based on the advanced media advertisement. It, again, it's, it's a narrow, very narrow rule. It says, one, it has to be the applicant. Two, it has to be an advertisement by the applicant. And three, it has to be on the radio, on TV, or in a, a newspaper of wide circulation such as the L.A. Times. I think the, the, it's a reasonable rule of thumb that if someone is going to advertise, and again, this is the applicant advertising such an event in one of those, in one, in one of those forms, that, that event may well, you know, we can assume that you're going to, that event will, will bring in 150 people. And remember, all of this, all that this does, it doesn't, the city doesn't turn down events. I think that's clear from the record. And so all this means. Unless they're really unpopular, like say the Ku Klux Klan. We wouldn't turn those down. Well, they really wouldn't have to apply for a permit, would they? Because they have no chance of getting 150 people. And that's why I think. As long as they don't block traffic, they can demonstrate without a permit. Is that right? That's correct, Your Honor. That's why I believe that opposing counsel's reliance on Church of American Knights of the KKK versus City of Gary, Indiana, is, I mean, that case is in a posit. Because, you know, in that case, only 50, you know, only 50 Klan's people came to the event. They wouldn't need it. They wouldn't need it. But from whence do you get your conclusion that the people, the hecklers, quote, don't count? It says an activity or event of 150 or more persons on city-owned, controlled or maintained property. That's what the A.I. says. The ordinance says, I don't know if I have it here, but it says something similar. An activity or event involving 150 or more persons. So how are you supposed to know that you don't count? I believe that's in the A.I., but it's the consistent. But if I'm mistaken, Your Honor, it's the consistent, unchanged, and I represent to the Court that that is the, that is how the ordinance is administered. It looks at, we are looking at participants in the event. Well, if I'm reading the right thing at page, I think this is 29 of the excerpts. Am I looking at the right thing? An activity of a group of 150 or more persons on city-owned, controlled or maintained property? That's correct. That's not what the ordinance says, though. Where's that? The ordinance says in any activity or event involving 150 or more persons. I'm reading from Ordinance 2008, Council Meeting 5801. Is that? Are you reading from the A.I.? These things keep changing. I don't know if I'm reading. You might be reading from the A.I. I'm not, I'm not sure which. I'm reading excerpts of records, plaintiff's excerpts of records at page 21 and 29. And I was thinking that answers the question because it has, you have to be part of the group to count as 150. But I don't know if I'm looking at the right version. If you're not part of the group, if somebody is heckling the group, you're not part of the group, you're not part of the 150. That's correct, Your Honor. But I don't know if that's the right ordinance. I don't believe that's the current version. That is not. But it's not the ordinance. But I understand. On your publicity presumption, let me just ask something. You omit the Internet. You don't think you could get 150 by blog? That's right. We could have included that. We did not. And so. That makes, to me, that makes it seem like your presumption is arbitrary because if you're going to really be worried about that, you would be concerned about the Internet, too. The presumption was based on a specific experience that the city had about an event that had been widely advertised in a newspaper of general circulation like the L.A. Times. And we had hundreds of people, and yet there was no, the applicant, you know, had assured the city that they had, that it was going to be a small event even though they advertised it in that way. We had hundreds of people come to that event based on the advertisement. It created incredible traffic problems, incredible safety problems. And that was the genesis of this. The Internet might be used. It's more difficult with it. We wanted it to be very narrow. If you use the Internet, then what if the organizer simply sends out emails to its members? It seems to me that that was of a different, it seems to us, that that was of a different character than if you put an advertisement on the radio, just in terms of the reach. I'm thinking in terms of, say, Howard Dean's campaign, where he could instantaneously reach millions of people by pressing one button. And, you know, isn't that something that you could do, set up, especially in Santa Monica? I think it would have been possible for the city to include that, but we wanted this, in crafting that presumption, the city was cognizant and wanted it to be narrow in its scope. And that's why it chose that. The other thing, if I could address it real quick, because the court, and this may be the conclusion of the court, irrespective of what I say, I understand that, but I just, I want to be clear. The ordinance has not been changed. First I'll talk about the ordinance and then the AI. The ordinance has been changed on, I believe, three occasions since it was adopted in 2001. And it was, it's been changed, as has the AI, based on changes in the case law and based on experience. And I'll give the court a good example. We had a provision in the ordinance that said, designated certain parade routes. This is the way you conduct a parade if you want to shut down the entire street. Well, someone wanted to do a parade and there was construction on part of that route. Well, technically, under the ordinance, there was no authority for staff because that was the ordinance and staff follows the ordinance. There was no authority to deviate from the route. We couldn't. Staff couldn't because it doesn't have that discretion. It doesn't exercise that discretion. The ordinance was amended to indicate that these are the routes but if there is some construction or some other activity of that nature, then the staff    Those are the kinds of changes that are that are that are that are that are that are that are that are that are that are that are That's what it was supposed to be doing. It gets a little bit hairy. Let me ask you a different question. Just about the indemnity clause. Do you agree that the Long Beach pay rights case I'm sorry you want to interrupt. Do you agree that the Long Beach case held indemnity clause of this kind should be out. No I totally disagree with it. I totally disagree. Tell briefly why. The Long Beach case clearly invalidated an insurance  but one of the reasons that they invalidated the insurance requirement and they say it in the Long Beach case. The Long Beach required them to identify the city required the applicants to identify the city against alleged acts and omissions. And one of the reasons that the insurance requirement was overreaching is because of the participants waiver of liability because of the hold harmless. But you do agree that under the hold harmless clause even if the city isn't liable there's still a duty to pay for any mitigation costs. Right. The duty is to defend. But the identification provision is not this isn't the Claiborne situation even if that case were relevant which we don't think it is. This is not the identification in hold harmless doesn't relate to any occurrence at the event whether it's caused by the injuries or damage caused by the applicant or the applicant's employees or the applicant's agents. It does not cover damage that's a result of hecklers. And in fact that type of distinction was noted as being extremely important and I'm trying to find the case for you in the case it was a district court case but in Van Armand that we're talking about where you have a narrowly tailored provision limiting the permittee's liability to harm caused by the action of the permittee, the sponsoring organization and the individuals acting under its authority then that waiver provision identification provision is appropriate. And I think in a way that that gets back to the reason that insurance provisions have been invalidated in the past because what happens with insurance if you have to go out and get insurance on the open market, the seller of that insurance is going to look at the nature of the event to determine how much it's  to cost you. And so that's why with this waiver provision it doesn't run afoul when it's focused narrowly in the way we focused it. The applicant is not required to identify the conduct of  the event. I appreciate that. The A.I. is intended principally to be a guide to control staff. That's what administrative instructions are. We've made it available to the public. I'm still baffled by this publicity thing. You read in the New York, somebody on the staff reads in the L.A. Times that there's an ad for some event and it calls up the person making the ad and says you need a permit. And they say we're not going to have 150 people, we don't want to  permit. And they don't get a permit. There can't be a problem for them not getting a permit unless they have more than 150 people. I think that's right. I don't believe that the ordinance would be violated. It is an event in a park that doesn't have more than... It couldn't be because the ordinance doesn't say anything about publicity or advertising. As I said, it's meant to be a guide, a rule of thumb. I think it's a principled basis for assuming that an event will exceed that. So the A.I. is meant principally for internal, for staff. So there are handouts for both applicants and for the public. As you indicated before, there's a website that has detailed information about how this program works. So as I indicated before, while the A.I. is available to the public, there are a number of other ways to gain information about the A.I. and the contents of the information that's readable to the public. We've gone way over time. If my colleagues have no further questions, we should probably quit. Just one comment. This is my comment. We had a request for judicial notice. I assume that the Court will review that as part of this. Thank you so much. Thank you, Counsel. Santa Monica Food is way over. Unless my colleagues wish to hear rebuttal, we're done. I wouldn't mind hearing it for about a minute and a half. Okay. Go ahead for a minute and a half. If your client wants to comply with the law, looks on the city code, and sees that they don't need permits for certain activities, or they do need a permit for a certain activity, and then decides not to hold a demonstration or a rally because they would need a permit for a certain activity, your Honor, Judge Wardlaw suggested that there were other places in the city that would be proper locations for spontaneous speech. And one of the areas that your Honor suggested was the beach. In fact, you cannot be on the beach for any activity. You haven't challenged that, which I don't know why you know it surprised me, but you haven't. Well, that's true, your Honor, but you can't be there except for any beach. Well, but you, because that became an administrative instruction that occurred after we filed the litigation in the district court. So, you know, we're in this difficult position, too, of these shifting administrative instructions. They haven't challenged that. Okay. But under one, the administration instructions, to answer your Honor's questions, have no force and effect. They are, as the city attorney said, guidelines for the staff, administrative things about how to handle things, but they have no force and effect. Under Forsythe, pardon, your Honor? I was the    Okay. Thank you.   Thank you. Thank you. Thank you. Thank you. Thank you. I have Santa Monica Food Not Bombs versus Santa Monica is submitted. We'll recess for ten minutes. All rise. This court stands in recess for ten minutes. All rise.  stands in recess for ten minutes.
judges: Kleinfeld, Wardlaw,berzon